IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-47-RM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ANTHONY DANIELS,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
Jury Trial, Day 1

_____

      Proceedings before the HONORABLE RAYMOND P. MOORE,
Judge, United States District Court for the District of
Colorado, commencing at 8:30 a.m., on the 10th day of July,
2017, in Courtroom A601, United States Courthouse, Denver,
Colorado.

**APPEARANCES**

      JASON ST. JULIEN and PETER McNEILLY, Assistant U.S.
Attorneys, 1225 17th Street, Suite 700, Denver, CO, appearing
for the Plaintiff.

      ROBERT PEPIN and LAURA SUELAU, Assistant Federal
Public Defenders, 633 17th Street, 10th Floor, Denver, CO,
appearing for the Defendant.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Tamara Hoffschildt, 901 19th Street,
Room A251, Denver, Colorado, 80294, (303) 292-1088

**PROCEEDINGS**

1

2          *THE COURT:* All right.  You may be seated.  Members of

3     the jury, we've now begun the trial in the case that you have

4     heard about during process of jury selection.

5          I'm going to give you some instructions now that will

6     help to you understand what will be presented to you, and how

7     you should conduct yourself during the course of the trial.

8          Later, at the end of the trial, I will give you

9     detailed guidance on the law, and how you should go about

10    reaching your decision in this case.

11         So I begin with the discussion of your role.  It will

12    be your duty to find from the evidence what the facts are.  You

13    and you alone will be the judge of the facts.  You will then be

14    charged with applying the law, as I give it to you, the facts

15    as you find them.  You must follow the law as I give it to you,

16    whether you agree with it or not.  What you think about the

17    law, or what you think it should be, has no place, whatsoever,

18    in this trial.

19         Now, I recognize that that may seem heavy-handed to

20    you, but understand that there's a type of balance in a trial.

21    I am the judge of the law and will decide all legal matters.

22    What I think about the facts is of no importance, and has no

23    place in this trial.  Nothing that you see me do, nothing that

24    you hear me say, during the course of the trial, should ever be

25    interpreted by you as any indication as to what the facts are

1   or should be or what your verdict is or should be or should not

2   be.

3           I want to talk to you, briefly, about the parties, and

4   you have been introduced to them.  In terms of the government,

5   you will sometimes hear -- well, in terms of both sides, you

6   will sometimes hear me refer to them by any number of different

7   names.  The United States, I may sometimes refer to as the

8   government; less likely, the plaintiff or the prosecution.

9   Regardless, this is simply a title that the government has.  If

10  I use the word plaintiff or prosecution, it's a title that the

11  government has when it brings a criminal charge.

12          Mr. Daniels is the defendant, that is the title that

13  we give a party against whom a charge is brought.  The titles

14  that the parties hold have no importance or significance,

15  whatsoever, beyond what I just told you.  It's simply labels

16  for me to refer to them by.

17          In terms of the charges, this is, in fact, a criminal

18  case.  The trial concerns a charge brought by the government

19  against Anthony Daniels.  That charge is contained in a

20  document called the Indictment, and I have spoken to you

21  earlier about what an Indictment is.  I have also previously

22  described the Indictment to you, in general terms.

23          Here, that Indictment consists of a single count for

24  your verdict.  It alleges that Mr. Daniels did, on November

25  29th, 2016, possess a firearm, illegally.  The specifics of the

1   charge I will now read to you.  The charge in Count 1 is that

2   on or about November 29, 2016, in the State and District of

3   Colorado, the defendant, Anthony Daniels, having been

4   previously convicted of a crime, punishable by imprisonment for

5   a term exceeding one year, did knowingly possess a firearm, in

6   and affecting interstate commerce, in violation of Title 18

7   United States Code Section 922(g)(1).

8           To this charge, Mr. Daniels has responded by pleading

9   that he is not guilty.  Understand, as I have told you, that

10  the Indictment is simply a statement of the charge made by the

11  government against the defendant.  I'm sorry, did -- did you --

12  I thought somebody raised their hand as I looked down or up.

13  Okay.  The Indictment is not evidence of guilt or of anything

14  else.  As I said, the defendant has pleaded that he is not

15  guilty as to this charge, and he must be presumed to be not

16  guilty.  He may not be found to be guilty by you, unless all of

17  you, unanimously agree that the government has proved his guilt

18  beyond a reasonable doubt.

19          This then is what the trial is about, whether the

20  defendant will be proved to be guilty, beyond a reasonable

21  doubt, of the charge that has been made against him, based

22  solely on the evidence admitted during the course of this

23  trial, and that decision is one that will be made solely by

24  you.

25          In making this decision, you are not to concern

1    yourself, in any way, with what sentence the defendant might

2    receive, if you should find him to be guilty.  Your function is

3    solely to decide whether the government has met or carried its

4    burden of proving the charge to you beyond a reasonable doubt.

5    If, and only if, you find the defendant guilty, it will then

6    become my duty, and mine alone, to determine and pronounce

7    sentence at a later date.

8         You have heard me talk about the evidence.  Let me

9    tell you what that means.  The evidence from which you will

10   find the facts in this case and make your decision will consist

11   of the testimony of the witnesses, who will testify from the

12   witness stand, any documents are other items received in

13   evidence, during the course of trial, any facts that the

14   lawyers may agree to, or to use the legal term, stipulate to,

15   as well as any facts, if any, that I instruct you to find or

16   take as true.

17        Certain things are not evidence and cannot be

18   considered by you at all.  Things outside of the courtroom are

19   not evidence.  And I will discuss such things with you in a

20   moment, but there are a number of things that occur in this

21   courtroom, during a trial, that are also not evidence,

22   statements, arguments, questions of lawyers are not evidence.

23   Objections to questions that one party or the other may make,

24   and any rulings I make on those objections are not evidence.

25   Testimony that I instruct you to disregard is not evidence.  In

1    terms of evidence, please keep in mind there are two types of

2    evidence, direct evidence; such as, what a witness says he or

3    she did or observed, and circumstantial or indirect evidence,

4    proof of facts from which you can infer other facts.  An overly

5    worn example being that if somebody, for example, were to come

6    into the courtroom now and he or she were to be damp or wet,

7    you might infer that it was raining outside.

8           Both types of evidence must be considered by you.  One

9    should not be deemed to be better or worse than the other.  You

10   must make your decision based on all of the evidence with

11   regard to the evidence.  There may be times when I will tell

12   you that evidence can be considered only for a limited purpose.

13   If that occurs, what it means is that you may consider evidence

14   for some purposes, but not for others.  In the event this type

15   of evidence is admitted, I will provide more specific

16   instructions, at the time the evidence is admitted.

17          I have, on a number of occasions, told you, and I tell

18   you again, that this is a criminal case, and in a criminal case

19   the government has the burden of proving the defendant guilty

20   of the charge contained in the Indictment beyond a reasonable

21   doubt.  That means that the government has to produce evidence

22   which, after consideration of all of the evidence, leaves you

23   firmly convinced of the defendant's guilt.  If the government

24   fails to meet this burden, your verdict must be not guilty.

25          The defendant has no obligation in a criminal case to

1   prove that he is not guilty.  The law does not require the

2   defendant to produce any evidence at all.  And even if the

3   defendant elects to put on some evidence, even though he is not

4   required to do so, that does nothing to change the burden of

5   proof, which always rests on the government to prove guilt

6   beyond a reasonable doubt.

7        Now, the course of the trial is, roughly, as follows,

8   the first step will be what's called opening statements.  The

9   government, in its opening statement, will explain its view of

10  the case, and will tell you about the evidence that it intends

11  to put on before you.  The opening statement itself is not

12  evidence.  If any slides are shown or other matters played for

13  you or shown to you during the course of that opening

14  statement, those matters are not evidence either.

15       The purpose of opening statement is simply to give you

16  an understanding of what the government anticipates or expects

17  that the evidence will be.  It's sort of a roadmap to show you

18  the government's view of what lies ahead.  After the government

19  has given its opening statement, counsel for the defendant may

20  make an opening statement, or the defendant may choose to wait

21  until after the government has finished with the presentation

22  of its evidence before presenting an opening statement.  Either

23  way, the defendant's opening statement is, like the

24  government's, not evidence.  It is simply a roadmap to show you

25  what the defendant believes lies ahead by way of what the

1   evidence will or will not show.

2          After the initial opening statements, evidence will

3   then be presented from which you will have to determine the

4   facts.  The evidence will consist of the testimony of the

5   witnesses, documents and other things received into exhibits --

6   into the record as exhibits, as well as any facts the lawyers

7   agree to or stipulate to, and any facts that I may judicially

8   notice.

9          The evidence phase begins with the government offering

10  its evidence.  After the government has presented all of its

11  evidence, the defendant may, as I told you, make an opening

12  statement, if he delayed that opening statement from earlier,

13  and may also put on evidence.  But I remind you, Mr. Daniels is

14  not required to put on any evidence during the course of this

15  trial.  He is presumed to be not guilty, and he is not required

16  to prove it or to offer any evidence, whatsoever, in a criminal

17  trial.  The reason, as I have explained to you, repeatedly, is

18  that the Constitution of the United States grants him that

19  right, and the law places the burden of proof on the government

20  to prove guilt beyond a reasonable doubt.

21          If the defendant elects to put on evidence, the

22  government may then, when he is finished, follow that

23  presentation with an opportunity for what's called rebuttal

24  evidence.

25          At times during the course of a trial, a lawyer may

1    make an objection to a question asked by another lawyer, or

2    even for an answer given by a witness.  This simply means that

3    the lawyer or party is requesting that I make some decision on

4    a particular rule of law.  That is their job.  Do not draw any

5    conclusion from any such objections or from any rulings I make

6    on the objections.  If I sustain an objection to a question,

7    the witness may not answer.  Don't attempt to guess at what the

8    answer might have been, had I given the witness permission to

9    answer.

10        If I overrule an objection, the witness will answer,

11    but don't attach any particular importance to the fact that

12    there was an objection raised to the question.  If I tell you

13    not to consider a particular statement, you may not refer to

14    that statement in your later deliberations; and as I told you,

15    if I instruct you to consider a particular piece of evidence

16    for a specific purpose, you may consider it only for that

17    purpose.

18        During the course of the trial I may have to interrupt

19    the proceedings, from time to time, to confer with the

20    attorneys about the rules of law that apply.  Sometimes we will

21    talk briefly at the bench, and you have seen me do that over

22    here with the white noise.  Some of these conferences, however,

23    may take more time, and if that were to occur, I would excuse

24    you from the courtroom.  I'm telling you now that I will try to

25    avoid longer interruptions whenever possible, but please be

 1    patient, because even if it seems that the trial is moving more

 2    slowly than you would like, these conferences actually end up

 3    saving time in the end.

 4         During the course of the trial I may ask questions of

 5    a witness.  It is unlikely, but if I do so, that does not mean

 6    that I have some particular opinion about the facts of the

 7    case, only that I'm trying to bring out a fact or facts for you

 8    to consider.  You may not ask questions of any witness.

 9         Nothing that I do during this trial is meant to infer

10    or suggest that I have an opinion on the merits of the case

11    favoring one side or the other.  As I have told you, I do not

12    favor one side or the other.

13         You are to consider all of the evidence received in

14    this trial.  It will be up to you, the jury, to decide what

15    evidence to believe, and how much of any witness' testimony to

16    accept or to reject.

17         After you have heard all of the evidence, the

18    government and the defendant will each be given time to address

19    you in what is called final arguments or closing arguments,

20    telling you their view as to what the evidence has shown.

21    Because the government bears the burden of proof, the

22    government is given an opportunity not only to begin closing

23    arguments, but also to give a rebuttal argument, after the

24    defendant's argument has been given.  Just as the opening

25    statements are not evidence, the final or closing arguments are

1    not evidence either.  After these arguments, I will then

2    instruct you on the rules of law, which you are to use in

3    reaching your verdict.  You will then decide the case.

4         During the course of trial, I will permit you to take

5    notes.  You are not required to take notes, and you should not

6    feel, in any way, compelled to do so.  But let me give you a

7    few words of caution about notes, should you choose to take

8    them.  You must not allow note-taking to distract you from the

9    proceedings.  You may find that it is difficult to take notes,

10   to observe the witnesses and listen to the ongoing testimony

11   all at the same time.  If so, observe the witnesses and listen

12   to the testimony.  Those are your priorities.

13        Also, there's, sometimes, a tendency to attach too

14   much importance to what a person writes down, compared to what

15   is not written.  Some testimony may be considered unimportant

16   by you at the time that it is presented, and therefore, you

17   don't write it down, but later, after other witnesses have

18   testified, that prior statement may be deemed to take on

19   greater significance, in light of all of the evidence

20   presented, the final arguments or my instructions.

21        Finally, remember, notes will not necessarily reflect

22   exactly what was said.  Because of all of these things, I

23   instruct you that your notes are only a tool to aid your

24   individual memory.  You should not give your notes preference

25   over your independent recollection of the evidence.  You should

1   not be unduly influenced by any note of any other juror.   Notes

2   are not evidence, and they are, by no means, a complete outline

3   of the proceedings or a list of the highlights of the trial.

4   Your memory is and should be your greatest asset when it comes

5   time to deciding this case.

6           If you do take notes, initial them and leave them in

7   the jury room overnight.   Do not discuss the contents of your

8   notes until after the trial, when you will have begun your

9   formal deliberations with your fellow jurors.

10          Speaking of notes, I told you Ms. Hoffschildt is

11   taking notes stenographically of everything that is being said

12   in this courtroom.   This is basically to assist with later

13   appeals.   There will not, however, be a typewritten copy of

14   testimony available for you, for your use in deliberations.

15   There will not be an opportunity for rereading of testimony

16   from her notes.   On the other hand, any exhibits that are

17   received into evidence will be available to you during the

18   course of your deliberations.

19          Over the course of the trial, if you need to tell me

20   something, simply give a note, signed, to Ms. Pearson and she

21   will give it to me.

22          This then is an overview, a broad overview, of the

23   trial process.   Before we turn to opening statements, there are

24   some final instructions I must talk to you about in terms of

25   what you must do and not do during the course of trial.

 1          You, as jurors, must obey the following rules and

 2    admonitions.  First, forget and put aside anything and

 3    everything that you think you know about the law or trials.  We

 4    now live in an information age where everyone, to some degree

 5    or another, has been exposed to such information.  Maybe you

 6    read a book, maybe you watched a television show or a movie,

 7    maybe you watched an actual trial, either in person or on

 8    television.  Some of you may have -- may have attorneys as

 9    friends or neighbors or even family members.  Others may even

10    have sat on other juries, in other cases.  Maybe you think you

11    know how things work for some other reason; doesn't matter.

12    All of this, any outside source of information, must be put out

13    of your mind and completely disregarded.  Television, books and

14    movies are simply entertainment.  Information on the Internet

15    and other sources is often wrong.  Even other trials involve

16    different laws, different issues and different procedural

17    rules.

18          What you need to know, and the only things that you

19    may consider by way of the evidence will be presented to you

20    within the four walls of this courtroom.  What you need to know

21    by way of the law, I will tell you.  Nothing outside of this

22    courtroom can be considered by you in any way or for any

23    purpose.

24          Second, at no time during the trial may you conduct

25    any independent research about the law, the issues in this case

1    or any group or individual involved in the case, including the

2    lawyers, the parties and the witnesses.

3         You must not consult any dictionaries or reference

4    materials.  You must not Google or search the Internet.  You

5    must not resort to websites, blogs, physical maps, Apple maps,

6    Google maps to view any locations referenced during the course

7    of the trial, nor may you visit such sites.  You may not use

8    any electronic or other tools to obtain information about this

9    case or to help you decide the case.  You must confine yourself

10   to what is presented to you in this room.

11        You have a role in this trial, it is a critical and a

12   constitutional role.  You are the judges of the facts presented

13   here in this courtroom.  You must stick solely to that role.

14   You are not researchers, you are not investigators, you are not

15   sleuths and you will help no one if you attempt to be.

16        Third, do not talk with anyone not a part of these

17   proceedings about this case, or about anyone involved in this

18   case until after the trial has ended and you have been

19   discharged as jurors.  By *anyone*, I include members of your

20   family and your friends.  You may tell people that you are a

21   juror, but do not tell them anything else about the case.  And

22   when I tell you not to talk about or communicate with anyone

23   about the case, I specifically include any and all comments and

24   communications through electronic means; such as, email or any

25   form of social media, regardless of whether or not there's a

1    back-and-forth dialogue.

2           What do I mean?  Do not tweet or use Twitter.  Do not

3    post on Facebook.  Do not use Instagram.  Do not post on any

4    blog.  Do not use any form of social media that I'm too old to

5    even recognize that even exists.  Do not text from your

6    computer or SmartPhone.

7           In short, during the time this trial is ongoing,

8    remain silent across electronic and social media, as it

9    pertains to this trial, until such time as the trial has ended

10   and you have been discharged as jurors.

11          Fourth, let me say the obvious, during the course of

12   the trial, you should not talk with any witness or with the

13   defendant or with any other lawyers at all.  If any lawyer or

14   party does not speak to you, as I have told you, it is because

15   they are not supposed to talk to or visit with you.

16          Finally, you should not discuss this case amongst

17   yourselves until I have instructed you on the law at the very

18   end of this trial and you have gone to the jury room to make

19   your decision at the end.  It is important that you wait until

20   all of the evidence is received, until you have heard the

21   arguments of counsel and you have received my instructions on

22   the controlling rules of law before you begin to talk about or

23   deliberate amongst yourselves.

24          Please, keep an open mind throughout the trial,

25   reaching your conclusions only at the end, after you and your

 1    fellow jurors have had the opportunity, at the close of the

 2    case, to discuss the evidence together.  And now that the trial

 3    has begun you must avoid any and all media reports and

 4    discussions, if there are any, about this trial.  You may not

 5    watch, read or listen to any such reports.

 6         I stress these things with you for a very simple

 7    reason, a trial must be fair and it must appear to be fair, to

 8    all of the parties.  It simply cannot be fair or appear to be

 9    fair if the parties -- if the jurors, excuse me, allow matters

10    outside of the courtroom to have an impact, or even appear to

11    have an impact on your verdict or deliberations.  The parties

12    can only prepare for and respond to what happens in front of

13    them.  What they see in this courtroom.

14         A trial cannot be fair if parties have neither

15    knowledge nor control over the things that a juror considers.

16    And there are consequences to disregarding these instructions.

17    Violation of these instructions could cause a mistrial;

18    meaning, that all of our efforts over the course of the trial

19    will have been wasted, and we will have to start again, all

20    over, with a brand-new trial before a brand-new jury.  The

21    parties have invested considerable time, effort and expense

22    into preparing this case for trial.  The Court, as well, has

23    invested considerable time and expense, as well.  More

24    importantly, each of you and your fellow jurors have made and

25    will make sacrifices to serve on this jury.  All of that will

1    be wasted, if any one of you, out of simple temptation,

2    curiosity or other innocent reason violates these instructions.

3            Lastly, in terms of what you may bring with you here

4    during the course of the trial, your cell phones must be turned

5    off during your time here in the courtroom.  Ms. Huff, I speak

6    to you specifically, and say, don't you worry about the noise

7    that your medical device may or may not make, whatever needs to

8    happen there, it happens, and we will adapt to you.  You do not

9    need to adapt to us.

10            *THE JUROR:*  Thank you, Your Honor.

11            *THE COURT:*  But beyond that, cell phones should be

12    turned off during your time in the courtroom.  It's not enough

13    to just set them to vibrate.  We have heard when things start

14    vibrating, it in some ways is more annoying than a ring,

15    because you can't tell where it's coming from.  This trial

16    needs your individual attention, and wondering who is calling

17    or texting is not consistent with that.

18            Finally, in terms of drinks, you can bring bottled

19    water into the courtroom.  No other form of liquid refreshment

20    and no food is allowed.  Please bear in mind that these

21    instructions apply now and throughout the entirety of the

22    trial, including all breaks and recesses.

23            Now, I'm going to give you an afternoon recess until

24    quarter of 4.  That may seem a little long, and it is, because

25    it is a little long.  But what's going to happen is that you

1    need -- you may need to make calls to people to tell them that,

2    *Oh, boy, I got picked*, and I am sure that's what each and every

3    one of you is thinking.  But regardless, you may need to

4    contact some people.  More than that, you need to get familiar

5    with the -- with the room where you will be reporting to, and

6    that is the jury room, which is outside this door and directly

7    across the hall.  There are facilities in the jury room that

8    you can use.  You will not need to go outside to the public

9    restrooms or facilities.

10          Beyond that, Mrs. Pearson needs to spend a couple of

11   moments with you, giving you general instructions on how things

12   will progress over the course of the time during the trial, and

13   also giving you credentials that allow you to get back to this

14   jury room.  Right now you have no ability to come through that

15   door at the end of the corridor, but she will give you

16   credentials that will allow that door to open for you.

17          So there are some things that you need to do, and

18   there are some things that she needs to do with you, that's why

19   I'm giving you the longer -- slightly longer break than

20   otherwise there would be.

21          So at this time, what I'm going to do is excuse you,

22   ask you to go out this door, directly across the hall, and wait

23   just for a couple minutes.  Ms. Pearson will be in there

24   shortly.  See, she is all ready to give you your credentials.

25          *THE COURTROOM DEPUTY:*  Please don't make any phone

```
 1   calls until I come back and talk to you, okay?

 2        (Jury out at 3:20 p.m.)

 3            THE COURT:  Mr. St. Julien, are you ready to go?

 4            MR. ST. JULIEN:  Yes, Your Honor.  We do have the Old

 5   Chief stipulation along --

 6            THE COURT:  Yeah.  And what I was going to tell you is

 7   that I prefer that the parties read the stipulations.

 8            MR. ST. JULIEN:  Absolutely.

 9            THE COURT:  So once you have done opening statement, I

10   don't care whether you do it at the beginning or the end of the

11   evidentiary presentation, but you can read that into the

12   record.

13            Is there anything about openings that needs to be

14   discussed with me?

15            MR. ST. JULIEN:  Nothing, Your Honor.

16            THE COURT:  All right.  How about you, Mr. Pepin?

17            MR. PEPIN:  Not that I know of.

18            THE COURT:  All right.  And I don't put time limits

19   on.  Obviously, if it seems like we're trying to get to 5

20   o'clock, just to get to 5 o'clock, or something like that, I

21   might speak up.  In fact, you can pretty much count on it.

22            The last thing I want to cover with you is something

23   that I raised at the trial-prep conference, and then I forgot

24   to mention it this morning.  What are we doing with regard to

25   this forfeiture?
```

1          *MR. ST. JULIEN:*  Nothing.

2          *MR. PEPIN:*  Zero.

3          *THE COURT:*  Nothing.  Hm?

4          *MR. PEPIN:*  Nothing.

5          *THE COURT:*  All right.

6          *MR. ST. JULIEN:*  Your Honor, I just -- two quick

7     points of clarification.  Mr. McNeilly will be taking care of

8     opening, and also what we plan to do, is prior to calling our

9     first witness, is to read the stipulation into the record to

10    the jury.

11          *THE COURT:*  That's fine.  That's fine, absolutely.

12    All right.  We will be in recess.

13          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

14       (Recess at 3:21 p.m.)

15       (In open court at 3:46 p.m.)

16          *THE COURT:*  Please be seated.  I assumed something,

17    it's been strapped in some way?

18          *MR. ST. JULIEN:*  Yes, Your Honor.  There's a zip tie

19    through the chamber.

20          *THE COURT:*  Okay.  All right.  Are we ready?  Okay.

21    Let's go get them.

22          *THE COURTROOM DEPUTY:*  Jury is present.

23       (Jury in at 3:47 p.m.)

24          *THE COURT:*  Welcome back, ladies and gentlemen.  Does

25    the government intend to make an opening statement?

1         *MR. McNEILLY:* Yes, Your Honor.

2         *THE COURT:* You may proceed, Mr. McNeilly. Remember,

3 ladies and gentlemen what I told you, opening statement are not

4 evidence.

5                       **OPENING STATEMENT**

6         *MR. McNEILLY:* Thank you, Your Honor. He said he had

7 a right to protect himself, and there's a lot of circumstances

8 you can think about where that may be true. Unfortunately, for

9 Mr. Daniels, one particular scenario where that wasn't true was

10 possessing a firearm, and that's because before he was

11 encountered by two Aurora police officers, on November 29th,

12 2016, he had already been convicted of a felony offense, and as

13 you know, felons are prohibited from possessing firearms in the

14 United States. He insisted he had the right to arm himself and

15 to bear arms, and when he said that to the officers, he was

16 referring to the firearm that they had found shoved between the

17 two armrests in the front seat of the Chevy El Camino that he

18 was driving with no other passengers.

19         Now, on the night, around 11, a little bit after 11,

20 of November 29th, to 2016, Officer Doug Pearson and

21 Eugene VanDyk were patrolling in their unmarked Dodge minivan

22 in Aurora, Colorado. They were driving along and they saw the

23 defendant driving his El Camino. They noticed, initially, that

24 it had an altered suspension that made it ride higher than it's

25 was legally allowed to do. They ran it through two systems

1   that they use in their car, and they called the Colorado

2   Department of Motor Vehicles.  All three of those checks

3   returned no record for the license plate that they saw on the

4   defendant's El Camino, because of that, they turned on their

5   red and blue lights, they pulled him over and they did a

6   traffic stop.

7          Initially, he appeared as if he was pulling over, but

8   his car lurched forward once, and they got him to come to a

9   stop.  Officers Pearson and VanDyk walked up to his car and

10  noticed not only had the defendant not turned off his car, he

11  had not put it in park, he was on his phone and he was not

12  responding to simple verbal commands they were giving him.

13         In fact, when he did respond to what they were saying

14  he asked if he could pull his car yet forward, around the next

15  corner, and park it somewhere different than what they already

16  told him.

17         Officer Pearson had approached on the driver's side

18  and was the person who was primarily giving the defendant the

19  simple commands to provide license and his registration, to put

20  his car in gear and to put it -- and to turn it off,

21  eventually, because he was concerned it was going to drive

22  forward.

23         Mr. Daniels was blatantly resistent to

24  Officer Pearson's directions.  He was more concerned with

25  talking to whoever it was on his phone than he was in having a

1    meaningful conversation with Officer Pearson.  Now, at the same

2    time Officer VanDyk came up on the passenger side of the car.

3    Officer VanDyk was there essentially as a cover officer for

4    Officer Pearson who was making contact with Mr. Daniels.  And

5    Officer VanDyk was shining his light into the car, just to see

6    what was going on in there, and he saw what he thought was a

7    firearm between the armrests, through the passenger window.

8    Didn't take long, he walked around to the windshield, and he

9    looked into the windshield, he could see what indeed was the

10   barrel of a firearm that was peeking out from between the

11   armrests.  He called it out so Officer Pearson could know what

12   situation they were faced with, and Officer Pearson then

13   directed the defendant, Mr. Daniels, to first put his hands up,

14   and then to put his hands on his face.

15        When Mr. Daniels eventually complied, Officer Pearson

16   pulled Mr. Daniels out of the car, placed him in handcuffs and

17   placed him under arrest.

18        After a little bit, Officer Pearson returned to the

19   car, recovered the firearm from that vehicle and saw that it

20   was, in fact, a Hi-Point, Model CF-380, 9 millimeter -- 380

21   caliber firearm, that was loaded with nine rounds, one of which

22   was in the chamber.

23        This is the event and the conduct that leads to the

24   one count of the Indictment that has been read to you.  Count 1

25   alleges that on or about November 29th, 2016, Mr. Daniels,

1  having previously been convicted of a felony, did knowingly

2  possess a firearm in or affecting interstate commerce.

3         Right there, in that description is everything that

4  the government will have to prove in this trial.  All of the

5  elements are summed up in that language right there.

6         In order to prove those elements beyond a reasonable

7  doubt, the government will present you with testimony.  We will

8  present you with video evidence, that was captured on the body

9  cameras worn by the two officers.  We will present you with

10  physical evidence; such as, the gun that was seized that night.

11  We will present you with documentary evidence, and obviously,

12  the testimony of each of the witnesses who has been involved in

13  this case.

14         You will hear first from Officers VanDyk and Pearson,

15  who described stopping the defendant in November of last year.

16  They will describe their interaction with the defendant.  They

17  will describe finding the firearm, seizing the firearm and they

18  will describe for you some of the comments that Mr. Daniels

19  made after they found that firearm.  Through the testimony of

20  Officers VanDyk and Pearson, you will also get the benefit of

21  seeing portions of the body-camera video that was captured that

22  night.  It will be introduced into testimony, they will be able

23  to provide some context, as they describe what it is you get to

24  see, and what it is you get to hear from your interactions with

25  Mr. Daniels.

1          Through Officer Pearson's testimony, specifically, we

2    will introduce the Hi-Point firearm, that was seized from that

3    car, so that you actually have the firearm that Mr. Daniels is

4    alleged to have possessed.  You will hear from a crime-scene

5    investigator named Darvin Harrell.  Investigator Harrell works

6    for the and Aurora Police Department and has for many years.

7    He will come and talk to you how he attempted to pull

8    fingerprints off the Hi-Point firearm, and the nine rounds of

9    ammunition that were found in it and how he wasn't able to do

10   that.  How there weren't any latent prints on the firearm.

11   Mr. Harrell will also explain how that doesn't surprise him, in

12   light of the surface of the Hi-Point that you will get to

13   observe, and also the factors that go into whether fingerprints

14   are made or remain on objects.

15         You will hear from a special agent with the Bureau of

16   Alcohol, Tobacco and Firearms, Sarah Burnett.  Her role in this

17   trial is very simple.  She is going to come here to tell you,

18   based on her experience and her training about something that

19   may be called interstate nexus.  This is simply the fact that

20   the firearm at one point moved from one state to another, and

21   she will offer you her opinion, having looked at that firearm,

22   researching the manufacturer of that firearm, that, in fact, it

23   did.  And you can even see, based on the markings on the slide

24   of the firearm it was manufactured in Mansfield, Ohio, and

25   obviously seized here in Colorado.

1              The government's presentation will be simple and to

2       the point, and that's because this case is simple.   The

3       defendant was prohibited from possessing a firearm, because he

4       was a felon.   When he was encountered by police in November of

5       last year, he had a firearm.   He couldn't quite buy himself

6       enough time to hide it any better than he did, and that's why

7       it was so hastily stashed between the armrests right there next

8       to him, within inches of his grasp.

9              Because Mr. Daniels is a felon, the law prohibits him

10      from having that firearm, and because the evidence will prove

11      his guilt of possessing it beyond a reasonable doubt, the

12      government will ask you, at the conclusion of this trial, to

13      find him guilty.   Thank you.

14           THE COURT:   Mr. Pepin, does the defense wish to make

15      an opening statement at this time?

16           MR. PEPIN:   Yes, sir, we do, Your Honor.

17           THE COURT:   You may.

18                           **OPENING STATEMENT**

19           MR. PEPIN:   Thank you.   Good afternoon, again.

20      Mr. Daniels is a convicted felon.   We have stipulated to that.

21      As a convicted felon, he is not allowed to possess a firearm.

22      That is a fact.   A gun was found in his car, and at that time

23      he was the only person in it; it's also true.   So let me go on

24      to the other things that are true about all of this.   On the

25      night that Mr. Daniels was arrested he had a valid driver's

1    license, he had registered his 1972 El Camino.  He had gone out

2    of his way to get collector's plate on that El Camino.  He was

3    minding his own business, driving home, not speeding, obeying

4    stoplights, turning appropriately, doing everything legally and

5    safely.  He had not been present when the firearm had been put

6    in his El Camino, and from the place that he was sitting, the

7    driver's side, it would have been unlikely that he would have

8    seen that gun as he got in and out of the car and drove.  And

9    yet, what you are going to be seeing, at least part of what you

10   are going to be seeing, is Anthony Daniels, on a cold winter

11   night, sitting on an ice-cold curb, on Havana Street, in

12   Aurora, Colorado, handcuffed.

13         It will be November 29th, about 11:30 p.m., and he

14   will be sitting there with his arms wrenched behind him, just a

15   few feet away from the car that he had been driving, legally

16   and safely, just a few minutes before.  And between the time

17   that he had been driving that car, minding his own business,

18   and the time he was sitting there with his arms pulled back, on

19   that curb, he had been stopped, he had been on the phone, with

20   a person he was clearly, as you will hear, trying to get advice

21   from about this stop.  Was asking the officers, *Why did you

22   stop me?  What's the probable cause*?

23         When a gun was spotted by the officer on the far side

24   of the car, he was told not to move his hands, which he didn't,

25   and then he was told to put his hands in front of his face,

1  told within a second, screamed at to put his hands in front of

2  his face, he did, held them there, and then, while he was

3  sitting there frozen, not moving, was grabbed and thrown onto

4  the pavement with a grunt that you will hear.

5       So when Anthony Daniels was sitting on that curb, his

6  arms twisted back behind him, his legs pretzel-like, and he was

7  spewing the things he was saying, talking about rights, that he

8  had a variety of them, words coming out in a jumble, in ideas

9  clashing into one another, some of them will sound familiar to

10  you.

11       *You don't have proper cause*, he was saying.  *My*

12  *license plates are good that car is an antique.  It's a 1982 El*

13  *Camino and qualified for collector plates.  I had valid*

14  *registration.  I broke no laws*, he says time and time again.

15  *What ordinance did I break*, he asks, and then there are going

16  to be things that are less familiar to you, because Mr. Daniels

17  believes in an idea system, a thought system involving

18  something called -- loosely associated with something called

19  sovereign citizenry or Moorish-American citizenry.  They are

20  associated with one another.  So you will here him say things

21  like, *I'm a Moor.  I'm an American nationalist.  I have a right*

22  *to protect myself*, he says, *To arm myself*, he says that, *I have*

23  *a right to travel.  You are impeaching my right to travel*.  I

24  don't have -- *You don't have a treaty law with me*.  He says all

25  of this, you will hear.  *I'm a sovereign.  You have committed*

*piracy.  I have a right to bear arms.  This is kidnapping.  I'm a foreign neutral.  I have a right to protect myself and my liberty.*  And these things spill out of his mouth one after another; different stages during this whole contact, but never once does he say, *I had a right to have that gun*.  And never once does he say that he knew that the gun was in his car, which makes absolute sense, because he wouldn't have known there was a gun in his car, as you will hear.

Like I said, you are going to hear that he did not put that gun in the car.  Probably going to wonder who, and I am about to tell you.  He had legally registered that car, and you will hear about that.  He had been driving down the street, not breaking any laws, and you will hear about that.

Elijah Daniels is Anthony Daniels' son.  He is 24 years old.  He is a full-time working forklift operator who is a spouse and a father of two, and has been working ever since he was 14 years old.  A hard-working young man.  He believes in taking care of himself and his family, and he happens to like guns.  He carries a gun.  He has a conceal permit, that he went and went and did the classes, did the stuff he needed to do, legally got the gun, and he has it, and he has that concealed permit to this day.  He had several guns.  One of them was a Hi-Point 380 handgun.

Elijah's father, Anthony Daniels, a little over a year ago or so, bought, together with a woman named

1   Jasmine Kimbrough, a 1982 Chevrolet El Camino, beat up, but

2   cool, and Elijah loved that car.  Elijah drove it whenever he

3   could, and it is, in fact, as has been told him, that when it's

4   cleaned up a little more, all that needs to be done with it,

5   these are trucks, for those of you who don't know, then that

6   car was going to be Elijah's.  He calls it his baby.  And on

7   days when he is not working, if he can, he likes to go over,

8   borrow that car, take it and drive it around.  And he generally

9   carries a firearm.  On this particular day, now he is off --

10   his day off is Tuesday.  November 29th, 2016, was a Tuesday.

11   Elijah Daniels, during the day, contacted his dad and said, *I*

12   *would like to borrow the baby*, and went over and picked up --

13   drove down south, considerably further from where he was,

14   picked up that El Camino, drove the car for much of the rest of

15   the day, until later in the day, when he got a message from his

16   dad saying, *Don't bring that too late, because I have got to go*

17   *over and take care of my father, your grandfather, this*

18   *evening, tonight*.

19        While he was driving the car around, Elijah was

20   carrying that gun.  He carries it in his waist.  He hides it

21   under a jacket or a shirt, because he doesn't want to make

22   people feel uncomfortable, but it made him feel uncomfortable

23   because it was pinching his skin under there.  So he took it

24   and he stuck it into an area beside him, where he was sitting

25   in the front of the car.  The place that he put it, is the

1  place where the police found it.

2        Now, let me say, what ended up happening was that he

3  went -- he was running a little bit behind, feeling like he

4  needed to get the car to his dad, dropped it off, hopped in his

5  car and forgot the gun.  The next time that gun was seen was

6  when Officer VanDyk, on the other side of the car, shined his

7  flashlight in and saw the gun inside the car.  Next time it was

8  touched was when Officer Pearson went in, took it, as you will

9  see, and took it apart.

10        And then here is the thing that you will also see, in

11  terms of what you could see from where Mr. Daniels was sitting,

12  it's a little hard to explain to you right now but I'm going to

13  try.  So this is a -- a vehicle that has two seats in the

14  front, as most cars do, or basically two seats, one moves

15  forward, one moved forward, as well.  There are armrests on

16  either side; passenger and driver's side armrests in the

17  middle.  This gun was found wedged between the passenger

18  armrest, which was up, and the passenger back of the seat.  In

19  other words away from the driver's seat.  Within reach?  Sure,

20  if you know it's there you could get it.  But on the other

21  side, and, and, I'm going to tell you this, unfortunately we

22  don't have good photos, not really good photos of exactly how

23  that thing was found, and what you could see from the angle of

24  the driver's seat.  I don't know why they weren't taken.  I

25  wasn't there that night.  We have done the best that we can,

1    and we will bring photos that we were able to take six months

2    later of just sort of the angles of the car, but in terms of

3    the gun itself, for some reason there's a body-cam photo,

4    because Officer Pearson was wearing one, when he went in, took

5    the gun out, but it is not quite ideal.

6            In any event, we have tried to put that together so

7    you can see.  It's clear, that that gun was on the other side

8    of the seat, so a person getting in the car, sitting in the

9    driver's seat, would not have seen it.  And yet,

10   Anthony Daniels was sitting on that curb, handcuffed, November

11   29th, oddly enough, upset, angry and frustrated, and saying the

12   things that he was saying.

13           Now, let me add a couple of other things.  The car,

14   you heard, was stopped because the license plate didn't come

15   back from the DMV.  We are not challenging that, but as far as

16   Anthony Daniels would have known, that car was legally

17   licensed.  I mean, one of the things that the officers are

18   going to tell you, collector's plate, no collector's plate, it

19   still had legal temporary registration.  It was good until the

20   16th of December.  It wasn't on the car because they got the

21   collector's plate.  What you are going to hear is you are going

22   to hear from the woman who co-owned the car with Mr. Daniels,

23   Ms. Kimbrough, will say that they got the car, in fact, they

24   had to get temporary stickers or -- tags, two or three times

25   before they were able to get the emissions up, so they could

1   get the collector's plates.

2         You will hear from his daughter, her name is Ashley

3   Daniels, the day that Mr. Daniels was down at DMV getting

4   collector's plate, you have to pay for them, then they mail

5   them to you.  They didn't have enough -- he didn't have enough

6   money, called her, she had to bring him 40 bucks to pay that.

7   And Venita Vigil, who Mr. Daniels was living with, at the time

8   the plate came, they were sent to the house, she was there when

9   he was there putting them on the back of the car, because they

10  had been mailed to them.

11        So whether the DMV made the right report to the police

12  or not, Mr. Daniels thought that he was in perfectly fine

13  shape, doing absolutely nothing wrong, contributing to his --

14  and causing so much of his outrage and upset that night.

15        And then, he was simply driving, appropriately, 11:30

16  at night.  Just a man driving down Colfax, making a couple

17  turns, nothing wrong, hadn't run a red light, wasn't speeding,

18  passed the police at an appropriate speed, in the lane, the

19  whole thing, and yet there he sat on that curb and here he sits

20  today.

21        What you will see, I dare say, from the evidence that

22  you view, is that there's this man who now you will have met

23  here, who was really railing against one of those terrible

24  situations where you are feeling helpless, stuck in some

25  whirlpool you had nothing to do with; like dealing with a loss;

1   something you care about, or a death or something that you just

2   couldn't change, and a railing against it; howling; trying to

3   do something to make it so that it was different; struggling

4   against it, because he had done nothing wrong.

5          So in the end with all of this, the place that we will

6   get to, is the end of this, where you will end up having to

7   make the decision.  There will be this ultimate question, the

8   question will be, is there proof that Anthony Daniels knew that

9   his son's gun was in that car, and the answer is going to have

10  to be, *No, there isn't*, and *Is there proof that he intended to*

11  *exercise control over that gun*, and the answer is going to have

12  to be no, and that, ladies and gentlemen, translates into not

13  guilty, and so there you have it.

14         Judge Moore referred to it in his instructions as

15  opening statement as the roadmap, that's as good of a

16  description as any.  What it says to me is that we're about to

17  enter into a street fight here.  Mr. Daniels can't leave until

18  this trial starts, so it's time to get at it.

19         Thank you Your Honor.

20         *THE COURT:*  All right.  Is government prepared to call

21  its first witness?

22         *MR. McNEILLY:*  Your Honor, may we first read the trial

23  stipulation of the parties?

24         *THE COURT:*  You may, sir.

25         *MR. McNEILLY:*  The parties have stipulated that the

1    following facts are true.  At all times relevant to the charge

2    in the Indictment the defendant, Anthony Daniels, had been

3    previously convicted of a felony; that is, a crime punishable

4    by imprisonment for a term exceeding one year, and

5    Anthony Daniels was convicted of such felony on February 9th,

6    2010.

7           The parties have also stipulated the Hi-Point Model

8    CF-380, 380-caliber pistol, bearing Serial Number P8098420 is a

9    firearm as defined in Title 18 United States Code Section

10   921(a)(3).  It functions as designed, and is capable of

11   expelling a projectile by the action of an explosive.

12          Your Honor, at this point, government asks to call

13   Officer Eugene VanDyk.

14          THE COURTROOM DEPUTY:  Please come forward, right here

15   to be sworn.  Right over here.  Raise your right hand, please.

16      (**Officer Eugene VanDyk** was sworn.)

17          THE WITNESS:  I do.

18          THE COURTROOM DEPUTY:  Please have a seat.  State your

19   full name and spell your last name for the court reporter,

20   please.

21          THE WITNESS:  Eugene VanDyk, V A N D Y K.

22                     **DIRECT EXAMINATION**

23   BY MR. McNEILLY:

24   Q   Are you an officer with the Aurora Police Department?

25   A   Yes, sir.

Officer Eugene VanDyk – Direct

1    Q    Officer VanDyk, how long have you been with Aurora PD?

2    A    Six years.

3    Q    What is your current assignment?

4    A    Gang Intervention Unit.

5    Q    How long have you been assigned to the Gang Intervention

6    Unit?

7    A    A little over two years.

8    Q    What previous assignments have you held with Aurora PD?

9    A    Patrol.

10   Q    Was -- were you assigned to the Gang Intervention Unit,

11   then, on November 29th, 2016?

12   A    Yes.

13   Q    What did your duties that night entail?

14   A    Basic patrol enforcement on that night in question.

15   Q    What is that?

16   A    Basically driving around, looking for possible gang

17   activity.

18   Q    Okay.  Did you have a partner?

19   A    Yes, sir.

20   Q    Who?

21   A    Officer Doug Pearson.

22   Q    And what were you and Officer Doug Pearson driving?

23   A    A unmarked white Dodge Caravan.

24   Q    Where, specifically, within the city of Aurora, were you

25   patrolling?

1   A    The Colfax corridor, which consists of Yosemite and

2   Potomac, basically.

3   Q    Between Yosemite --

4   A    Yes, sir.

5   Q    Did you encounter someone named Anthony Daniels, on

6   November 29th, 2016?

7   A    Yes, sir.

8   Q    Can you please explain for the jury how you came in contact

9   with Mr. Daniels?

10  A    Through a traffic stop.

11  Q    What precipitated the traffic stop?

12  A    In terms of when we observed him?

13  Q    Why did you stop him?

14  A    We stopped him due to the fact he had a raised vehicle,

15  larger tires, the suspicion being too high for that vehicle,

16  and then upon clearance of his license plate we could not

17  locate any type of record of that license plate on file.

18  Q    Those things were what made you pull Mr. Daniels officer?

19  A    Yes.

20  Q    How did you attempt to run his plates?

21  A    I cleared it through C.C.I.C. and N.C.I.C.

22  Q    Are those two separate computer systems?

23  A    It's run through one computer program on our laptop that is

24  in our vehicle.

25  Q    Okay.  Did you or Officer Pearson try anything else to see

1    if the plates that you saw on Mr. Daniels' car were valid?

2    A    Once it came back as not on file, Officer Pearson called

3    DMV Master Files to check on the license plate.

4    Q    What was the response from them, if you know?

5    A    According to their records, that license plate was not on

6    file.

7    Q    What kind of a car was Mr. Daniels driving?

8    A    An El Camino.

9    Q    Is that a Chevrolet?

10   A    Yes, sir.

11   Q    Please explain how things went when you pulled Mr. Daniels

12   over?

13   A    Once we pulled Mr. Daniels over, we initiated the traffic

14   stop by activating our lights.  Mr. Daniels abruptly pulled

15   over to the right.  We started to exit the vehicle.

16   Officer Pearson gave orders for Mr. Daniels to put the car into

17   park and to turn the car off.

18   Q    Did he initially come to a complete stop?

19   A    He stopped.  He did initially come to a stop, and then once

20   we approached he rolled forward again.

21   Q    Do you have an estimate how far?

22   A    Um, couple feet.

23   Q    Okay.  Did you or Officer Pearson have to give any other

24   commands or do anything in response to him driving forward

25   after having come to a stop?

Officer Eugene VanDyk - Direct

1  A   I did not, no.

2  Q   Okay.  Was anyone else present, besides you and

3  Officer Pearson, at this point?

4  A   No, sir.

5  Q   Okay.  Explain, approaching the car with Officer Pearson?

6  A   Officer Pearson approached on the driver's side of the

7  vehicle, still giving orders for Mr. Daniels to turn the car

8  off and put it into park.  I approached from the passenger

9  side, and began to check the inside of the vehicle, to make

10  sure; one, Mr. Daniels was the only person in there; and two,

11  if there were any type of weapons readily accessible.

12  Q   Why do you come up on the passenger side rather than

13  side-by-side with Officer Pearson?

14  A   That's just our tactics that we use.

15  Q   Okay.  Is there a strategic reason?

16  A   Officer-safety reasons.

17  Q   Were you and Officer Pearson wearing body cameras that

18  night?

19  A   Yes, sir.

20  Q   Is that standard in Aurora?

21  A   Yes, sir.

22  Q   Did those body cameras record audio, as well as video?

23  A   Yes, sir.

24  Q   And are they recording at all times?

25  A   When the camera is basically on, it needs to be activated

Officer Eugene VanDyk – Direct

1   to record, but when it is not recording, it is always

2   simultaneous loop of recording.  So it's recording at all

3   times, basically, yes.

4   Q   So practically speaking, how does that work?  If you

5   realize that you are pulling over someone like Mr. Daniels, how

6   do you ensure that your camera is going to actually record your

7   interaction?

8   A   So once, like on this instance, I stepped out of the

9   vehicle, I activated my camera, there's a slide down on the

10  camera, so.

11  Q   The switch is a slide down?

12  A   Yeah.  It's a slide -- it slides down to activate the

13  camera.

14  Q   So you are talking about this continuous loop that's

15  recording.  What impact does that have on, ultimately, what the

16  viewer of the video gets to see or hear?

17  A   So the initial audio will start recording as soon as the

18  camera is activated by the officer, or the switch is slid down.

19  There will be a 30-second buffer before that, that will have

20  video, but no audio.

21  Q   So basically this's the loop, it's been capturing 30

22  additional seconds of video?

23  A   Correct.

24  Q   But there will be no audio for that, because the camera

25  didn't know, essentially, you were going to slide the switch to

Officer Eugene VanDyk – Direct

 1   say that it's pertinent?

 2   A   Correct.

 3   Q   Okay.  Once you have been out on patrol, how do you

 4   actually transfer the video for your -- some other system?

 5   A   Manually upload by the officer, hit record on the computer.

 6   If it's not done during shift, it will be docked.  We have

 7   multi dock, that the camera is placed in and downloads that

 8   night after shift.

 9   Q   How do you preserve files?  Let's say again, you have got

10   Mr. Daniels' case, you had your interaction with him that

11   night, you want to preserve the files that were captured from

12   your body camera with the microphone, how do you do that?

13   A   So once the camera is docked, it will be uploaded into our

14   system, that system recognizes specific incident numbers that

15   the officer was on that, if there's a case number pulled that a

16   specific video will be attached to that specific incident,

17   automatically.

18   Q   Okay.  Did that occur in this case?

19   A   Yes.

20   Q   Have you had the opportunity to review your body cam from

21   November 29th, 2016?

22   A   Yes.

23   Q   Based upon what you saw, did it accurately capture that

24   event, as you recall it?

25   A   Yes.

1    Q    You got a binder there in front of you.  It's a white

2    binder.  Could you go to second tab, to Government's Exhibit 2,

3    please?

4    Q    Do you see what Government's Exhibit 2 is?

5    A    Yes.

6    Q    What is it?

7    A    It is a body-camera footage that belongs to my body camera.

8    Q    What you are looking at, though, is a disk; is that right?

9    A    A CD disk.

10   Q    Okay.  Have you seen that exact CD before?

11   A    Yes.

12   Q    How do you know you have seen that one?

13   A    This was the disk that was used in the trial prep that I

14   viewed on last Wednesday.

15   Q    Okay.  Have you put your initials on it to show that you

16   reviewed that particular disk?

17   A    Yes.

18   Q    How many files are on that disk?

19   A    Um, I believe two.

20   Q    And one is from the actual stop and enter -- initial

21   interaction; is that right?

22   A    Yes.

23   Q    The other one is from a period of the booking, back at

24   Aurora PD?

25   A    Back at the Aurora city jail.

1   *Q*   City jail.  Do those two files fairly and accurately record

2   your interaction with Mr. Daniels on November 29th, 2016?

3   *A*   Yes.

4   *Q*   Besides being shortened clips from the original video, have

5   they been altered in any way that changes the video?

6   *A*   No.

7   *Q*   Are there also time and date stamps on the videos?

8   *A*   Yes.

9   *Q*   Are the dates and times, which are on the videos, there on

10  Government's Exhibit 2, accurate to the actual date and times

11  at which the events in the video occur?

12  *A*   Yes.

13        *MR. McNEILLY:*  Your Honor, government moves to admit

14  Government's Exhibit 2.

15        *THE COURT:*  Any objection?

16        *MS. SUELAU:*  No objection, Your Honor.

17        *THE COURT:*  Received.

18     *Q*   (By Mr. McNeilly) We now request -- I have a couple

19  more questions before we publish, actually.

20        *THE COURT:*  All right.

21     *Q*   (By Mr. McNeilly) All right.  So starting with the

22  first video on that disk.  Approximately three minutes and 30

23  seconds, would you agree with that?

24  *A*   Yes.

25  *Q*   What is the jury going to see?

Officer Eugene VanDyk – Direct

1  *A*   They will see the initial traffic stop, and then our

2  approach to the vehicle, our interaction at the vehicle and

3  then Mr. Daniels being placed in custody.

4  *Q*   Then some interaction back by the curb, by your vehicle?

5  *A*   Yes, briefly.

6  *Q*   Will there be that period of 30 seconds of silence at the

7  beginning of this video?

8  *A*   Yes.

9  *Q*   That's simply a symptom of what you have already described,

10  the continuous loop, so that it can grab back 30 additional

11  seconds of video?

12  *A*   Yes.

13  *Q*   Okay.  With that then, I would ask permission to publish

14  the first file on Government's Exhibit 2?

15      *THE COURT:*  You may.

16      *MR. McNEILLY:*  Thank you, Your Honor.

17      *THE COURT:*  Ladies and gentlemen, it should come up on

18  your monitor, so you may want to tip those back so you can see

19  it.

20      (Whereupon the video was played for the members of the

21  jury).

22      *MR. McNEILLY:*  Stop the video right here.  Okay.

23  *Q*   Officer VanDyk, we have stopped the video.  The time on --

24  the actual time is 23:11, so 11 p.m. -- 11, 11 p.m.  What are

25  we looking at here?

1    *A*    My view of the side profile of the inside of the vehicle.

2         *Q*    (By Mr. McNeilly) Okay.  And at this point, are we

3    able to see where the firearm was in the vehicle?

4    *A*    Yes.

5    *Q*    Can you take either the stylus in front of you or use your

6    fingertip, draw your circle around where the firearm is.

7         Okay.  You have drawn a green circle.  Is it --

8    describe for us where it is within a green circle?

9    *A*    So it's basically placed muzzle forward, in-between the two

10   armrests in the seat.

11   *Q*    Okay.  So if I could circle again.  I have got a pink

12   circle.  Is more in the center of the pink circle?

13   *A*    Yes.

14   *Q*    Is it a white- or silver-looking object?

15   *A*    Yes, that's the top of the slide.

16   *Q*    Okay.

17   *Q*    So let's go ahead and resume play from 11:11 p.m.  Can we

18   go back just -- slide back just a little bit to 1:23 or so.

19   All right.

20         Officer VanDyk, looking from here, are you able to see

21   the firearm now on this view with it stopped at 11:17 seconds?

22   *A*    Yes.

23   *Q*    Can you circle it on your monitor, please?  Okay.  And you

24   have done so again with the green circle?

25   *A*    Yes.

1   Q    What portion of the firearm are we looking at?

2   A    You see the -- the top of the muzzle, basically sticking

3   forward, the barrel top of the slide, and then the top frame

4   part of the pistol itself.

5   Q    Okay.  Obviously, you know this now looking back and having

6   had your partner take the gun out of the car.  At what point

7   did you realize there was a gun in the car?

8   A    About right there.  I had an assumption that it was

9   possibly a gun from the side, that's why I moved to the front,

10  to make a better determination of what exactly that was.

11  Q    Okay.  And by this point, did you believe you were seeing a

12  gun in the car?

13  A    Yes.

14  Q    Okay.  I'm going to go ahead and remove the circle.  We

15  will resume play back.

16        (Whereupon the video was played for the members of the

17  jury.)

18  Q    Okay.  Let's go ahead and pause it here.  What did you do,

19  once you knew you had seen a gun?

20  A    I let my partner know there was a gun inside the vehicle.

21  Q    Why did you do that?

22  A    Based on previous actions, the fact that he was not

23  listening to Officer Pearson, it raised my awareness of what

24  was going on.  I was concerned with my safety and his, as well.

25  To let him know that there was a firearm in the vehicle.

Officer Eugene VanDyk – Direct

1    Q    What did we see you do in response to seeing the firearm on

2    this video?

3    A    Excuse me.  I let Officer Pearson know, and then I let our

4    dispatchers know that we had one at gunpoint, at that time.

5    Q    Seems like you switched flashlights.  What happened there?

6    A    I put my regular handheld flashlight away and I used the

7    weapons-mount light on my service firearm.

8    Q    Was your firearm drawn before this point?

9    A    No.

10   Q    Was Officer Pearson's drawn before this point?

11   A    I do believe that he had it out at his side, approaching

12   the vehicle.

13   Q    And so we see you move.  You put away the handheld and at

14   this point your weapon is drawn to the windshield?

15   A    Yes.

16   Q    Okay.  Let's go ahead and resume play back from here.

17          (Whereupon the video was played for the members of the

18   jury.)

19   Q    Okay.  And that concludes the playing of the first file on

20   Government's Exhibit 2.

21          It looked like you picked something up from the place

22   where Officer Pearson had placed handcuffs on Mr. Daniels.  Do

23   you recall doing that?

24   A    Yes.

25   Q    What was that?

Officer Eugene VanDyk – Direct

1    A    That was his body camera that had fallen off.

2    Q    You carried it over and set it on the hood of one of the

3    patrol vehicles until he could put it back on?

4    A    Yes.

5    Q    Did you or someone else transport Mr. Daniels somewhere

6    other than that street where he was pulled over?

7    A    We had a patrol officer in a caged car transport him to the

8    jail.

9    Q    Okay.  Did you have additional interaction with Mr. Daniels

10   there?

11   A    Yes.

12   Q    Why?

13   A    The booking process at the jail.

14   Q    Okay.  To be clear, there was more interaction on the

15   street, as well; is that right?

16   A    Yes.

17   Q    Okay.  So the booking process.  Prior to the booking

18   process, had someone advised him of his *Miranda* rights?

19   A    Yes.

20   Q    Who had done that?

21   A    Officer Pearson.

22   Q    Did you observe him do that?

23   A    I was present, yes.

24   Q    So the second video, where does it take place?

25   A    That's in our hard booking area in the Aurora city jail.

1  *Q*  Can you just kind of give some context to what we're going

2  to see here?

3  *A*  You will see Mr. Daniels seated on a metal bench.  I'll be

4  at a computer, at a desk next to the bench, completing the

5  necessary booking paperwork that is on the computer.

6  *Q*  Was there a back and forth, or what was going on between

7  you and Mr. Daniels?

8  *A*  There was -- I wasn't asking him any questions.  I was

9  doing my work so we could get him booked quickly.

10  *Q*  Was he speaking to you?

11  *A*  Yes.

12  *Q*  And is that what we will see in this video clip?

13  *A*  Yes.

14  *Q*  Could we please play the second file, on Government's

15  Exhibit 2?

16          (Whereupon the video was played for the members of the

17  jury.)

18  *Q*  Can you stop it there, please.  What is he telling you?

19  *A*  He is letting me know that we reacted too quickly.

20  *Q*  Did he say why you reacted too quickly?

21  *A*  I -- I would have to hear it.

22  *Q*  Could we go back and play it again?  If there is any

23  additional volume we could get, that would be great.  Yeah,

24  that's fine.

25          (Whereupon the video was played for the members of the

Officer Eugene VanDyk – Direct

1    jury.)

2    *Q*   Pause it there.   Does it sound like, *You reacted too quick,*

3    *because you seen a gun*?

4    *A*   Yes.

5    *Q*   Let's go ahead and play from there.

6            (Whereupon the video was played for the members of the

7    jury.)

8    *Q*   Okay.   During that portion, is that indicative of

9    statements he was making to you throughout the course of the

10   evening?

11   *A*   Yes.

12   *Q*   I want to turn on from Government's Exhibit 2, and have you

13   look at Government's Exhibit 1 in the binder there.   It's a

14   series of photographs.   If you would please just look -- make

15   sure you are familiar with each one of them, and look up at me

16   when you are.

17           Okay.   And I have seen you have done so.   What is that

18   collection of photographs in Government's Exhibit 1?

19   *A*   They are photos of the outside of Mr. Daniels' vehicle, as

20   well as the seating area of Mr. Daniels' vehicle.

21   *Q*   Are these taken some time other than the night he was

22   actually pulled over and arrested?

23   *A*   Yes.

24   *Q*   How do you recognize them to be that?

25   *A*   Pardon me?

 1   *Q*   How do you recognize those photos to have been Mr. Daniels'

 2   vehicle?

 3   *A*   It's the same vehicle from that night.  It's just in our

 4   impound lot.

 5   *Q*   And it's unique?

 6   *A*   Yes.

 7   *Q*   Do those photographs fairly and accurately depict his

 8   vehicle, and from that which you recovered the firearm on

 9   November 29th, 2016?

10   *A*   Yes.

11         *MR. McNEILLY:*  Your Honor, we offer Government's

12   Exhibit 1.

13         *THE COURT:*  Any objection?

14         *MS. SUELAU:*  No objection, Your Honor.

15         *THE COURT:*  Received.

16   *BY MR. McNEILLY:*

17   *Q*   Okay.  I would like to publish, first, page one of

18   Government's Exhibit 1.  Okay.  Officer VanDyk, this is the

19   first page, Government's Exhibit 1.  And what are we looking

20   at?

21   *A*   That is front view of Mr. Daniels' vehicle.

22   *Q*   Can we go to page two?  What is that?

23         *MS. SUELAU:*  Your Honor, we would ask that the pages

24   be marked separately, just for clarity of the record later on,

25   because I only see an Exhibit 1 sticker.

1      THE COURT:  Ms. Pearson, would you do me a favor and

2   retrieve the book, and in the lower right-hand corner, starting

3   with the number one, put a handwritten one, two, three, four,

4   which we will take as page numbers.

5      MR. McNEILLY:  Yes, Your Honor, there's seven.  I'm

6   sorry about that.

7      MS. SUELAU:  Thank you, Your Honor.

8      THE COURT:  All right.

9      THE COURT:  No pressure, Cathy.

10      THE COURTROOM DEPUTY:  Good.  Thank you.

11      THE COURT:  All right.  The exhibit book has now been

12   returned to the witness.  You may continue with your

13   examination.

14      MR. McNEILLY:  Thank you, Your Honor.

15      Q    (By Mr. McNeilly) What is page two, Officer VanDyk,

16   that is on the screen, as well as the binder, if you prefer to

17   just look at the screen, whichever is easy.

18   A    That is a photo from the rear of Mr. Daniels' vehicle.

19   Q    Okay.  Then page three.  What is depicted here?

20   A    A view of the seating, here from the right side of

21   Mr. Daniels' vehicle.

22   Q    Okay.  It looks like there's only a front seat in this car;

23   is that right?

24   A    Yes.

25   Q    Looking at this picture, are you able to tell where the

1  firearm was when it was discovered by you and by

2  Officer Pearson?

3  A    Yeah.

4  Q    Where was it?

5  A    Do you want me to circle?

6  Q    If you would, please.

7  A    Sure.  The armrests were up when we first saw it, but it

8  was in this general area right in there.

9  Q    Was it between the passenger armrest and the passenger

10 seat?

11 A    Yes.

12 Q    Okay.  And we will go ahead and we will just move on to

13 page six.

14         MR. PEPIN:  Six?

15         MR. McNEILLY:  Yes.

16     Q    (By Mr. McNeilly) Which, unfortunately --

17         THE COURT:  I was going to say, can you zoom out?

18         MR. McNEILLY:  It's vertical orientation picture.

19         THE COURT:  All right.  Maybe you can switch over to

20 ELMO?

21         MR. McNEILLY:  I can do ELMO.

22     Q    (By Mr. McNeilly) Officer VanDyk, you can look at the

23 binder, so you are familiar with it, but so everybody else can

24 benefit.  Okay.  Is this the page six, that you have in the

25 binder?

Officer Eugene VanDyk – Direct

1   A    Yes.

2   Q    And what are we looking at here?

3   A    The front profile, looking, basically, from the dashboard

4   back to the seat.

5   Q    At this point, are the armrests up?

6   A    Yes.

7   Q    And from this view, I know that it's a little bit

8   repetitive, but where was the firearm?  Can you circle it

9   again?

10  A    Sure.

11  Q    Okay.  You circle it, at this point then, between the two

12  armrests?

13  A    Yes.

14  Q    Okay.  And then --

15       MR. McNEILLY:  May I have just one moment, Your Honor?

16       THE COURT:  Yes.

17       Q    (By Mr. McNeilly) Two remaining questions,

18  Officer VanDyk.

19       Did Mr. Daniels ever tell you or Officer Pearson, in

20  your hearing, that the gun was not his?

21  A    No.

22  Q    And based on your observations, did he ever act surprised

23  that the gun was there?

24       MS. SUELAU:  Your Honor, objection, calls for

25  speculation as to Mr. Daniels' state of mind.

1      THE COURT:  Overruled.

2      Q    (By Mr. McNeilly) Do you need me to re-ask the

3   question?

4   A   Um, no.  My answer is no.

5   Q   Okay.

6      MR. McNEILLY:  Your Honor, I have no further questions

7   for Officer VanDyk.

8      THE COURT:  All right.  We will start but we're not

9   going to get very far.

10                      **CROSS-EXAMINATION**

11  BY MS. SUELAU:

12  Q   Good afternoon, Officer VanDyk.

13  A   Good afternoon.

14  Q   So I guess I will begin where the government left off

15  with -- with the photos that were taken, and I believe that's

16  Exhibit 2.

17      THE COURT:  All right.  Just to be clear, would

18  government cooperate in bringing up the exhibits for

19  Ms. Suelau, or do you want to use the ELMO, either way?

20      MR. McNEILLY:  It's Exhibit 1.  We are happy to

21  publish them, if that will help with this.

22      THE COURT:  But we're talking about the videotape.

23      MS. SUELAU:  That's my mistake.  It's Exhibit 1.

24      THE COURT:  All right.

25      Q    (By Ms. Suelau) If I could pull up Government's

Officer Eugene VanDyk - Cross

1   Exhibit 1, page one.  So this looks like it's during the

2   daytime?

3   *A*   Yes.

4   *Q*   And the footage we saw, initially, was from the evening?

5   *A*   Yes, ma'am.

6   *Q*   Late at night?

7   *A*   Yes, ma'am.

8   *Q*   So these photos were taken at another time?

9   *A*   Yes, ma'am.

10  *Q*   On the -- and I also see there's other cars in the lot.

11  *A*   Yes, ma'am.

12  *Q*   So this is in a lot somewhere?

13  *A*   Yeah M & M Towing.

14  *Q*   In a tow lot?

15  *A*   Yeah.

16  *Q*   After the vehicle has been towed from where Mr. Daniels

17  pulled it over?

18  *A*   Yes.

19  *Q*   And it's towed here?

20  *A*   Yes, ma'am.

21  *Q*   Okay.  So, turning to page three, please.  The night that

22  Mr. Daniels was pulled over, it was you and Officer Pearson?

23  *A*   Yes, ma'am.

24  *Q*   And there was also another car that pulled up?

25  *A*   Yes, ma'am.

Officer Eugene VanDyk – Cross

1   Q   So there was four officers out on the scene, at least?

2   A   Eventually.

3   Q   Okay.  But no -- no pictures were taken that night of the

4   car?

5   A   Not that I'm aware of.

6   Q   And you had access to a camera that night?

7   A   Like what kind of a camera?  Ones on our phones or like

8   a -- I'm -- just for clarification?

9   Q   Any kind of camera or camera phone, something that might

10   have taken a picture of the car that night?

11   A   Yeah, we didn't, yes.

12   Q   But these pictures were not taken that night?

13   A   No, ma'am.

14   Q   And, you know, right after Mr. Daniels got out of the car,

15   that would have been the moment when the car most resembled

16   when Mr. Daniels was in the car?

17   A   Yes.

18   Q   But there's no photos from that time?

19   A   Just the camera footage.

20   Q   So I see in this picture the armrests are down?

21   A   Yes.

22   Q   From -- from your video, it seemed that the armrests were

23   up?

24   A   Correct.

25   Q   So the armrests at least have been moved?

Officer Eugene VanDyk - Cross

1    *A*    Yes.

2    *Q*    Please turn to page four.  Again, here the armrests are

3    down?

4    *A*    Yes, ma'am.

5    *Q*    On both the passenger and the driver's seat?

6    *A*    Yes, ma'am.

7    *Q*    Please pull up Government's Exhibit -- the Exhibit 1, page

8    six.  Here in this picture, the armrests are up?

9    *A*    Yes.

10   *Q*    So, presumably, whoever took this picture, put the armrests

11   up?

12   *A*    Presumably, yes.

13   *Q*    Earlier, with Mr. McNeilly, you circled where the gun was

14   when you spotted it.  Could you go ahead and grab your stylus

15   and do that again for me?

16   *A*    Sure.

17   *Q*    So you're drawing between the passenger armrest and the

18   driver armrest?

19   *A*    Yes.

20   *Q*    Okay.

21        *MS. SUELAU:*  You can take that off the computer?

22   Thank you.

23        *Q*    (By Ms. Suelau) So, Officer VanDyk, you are part of

24   the Gang Intervention Unit; is that correct?

25   *A*    Yes, ma'am.

1   Q   And essentially as part of that unit, you target gang

2   members in the City of Aurora?

3   A   Yes.

4   Q   You gather intel on gangs?

5   A   Yes.

6   Q   And gather intel on specific gang members?

7   A   Yes.

8   Q   So your job is really to be familiar with gang members in

9   Aurora?

10   A   Yes.

11   Q   Prior to November 29th, 2016, you weren't familiar with

12   Anthony Daniels?

13   A   No, I was not.

14   Q   So on that night, you were in an unmarked police car?

15   A   Yes.

16   Q   And that basically means that it doesn't say in big letters

17   across the side Aurora Police Department?

18   A   No, it doesn't.

19   Q   It's just a white van?

20   A   Yeah.

21   Q   Just your standard issued, I believe, Dodge Caravan?

22   A   Yes.

23   Q   But it's also a -- on the outside there's no visible

24   lights, right?

25   A   No, ma'am.

Officer Eugene VanDyk – Cross

1  Q   And you don't,  you know -- you are undercover, so you are

2  not driving around with your siren on?

3  A   Correct.

4  Q   At some point -- it is equipped with lights and sirens

5  though?

6  A   Yes.

7  Q   At some point you activated your lights and sirens?

8  A   Officer Pearson did, yes.

9  Q   At this point, you have been in the minivan following

10  Mr. Daniels for several blocks?

11  A   Yes.

12  Q   So the area you were in is East Colfax, and I believe it's

13  considered a high-crime area?

14  A   Yes.

15  Q   And by that, because you are patrolling, you are looking

16  for drug activity?

17  A   One of them, yes.

18  Q   Okay.  And prostitution activity?

19  A   Yes.

20  Q   And gang activity?

21  A   Yes.

22  Q   So you spot the El Camino on East Colfax?

23  A   Yes.

24  Q   And the car is not familiar to you?

25  A   No.

Officer Eugene VanDyk – Cross

1    Q    And Mr. Daniels is not familiar to you?

2    A    No.

3    Q    So, as far as you know, this car is not involved in drugs?

4    A    Not at this time, no.

5    Q    And sorry, as far as you know, the car was not involved in

6    drugs?

7    A    No.

8    Q    And the car was not involved in gang-related activity?

9    A    No.

10   Q    And it wasn't involved in prostitution?

11   A    No.

12   Q    You just noticed the El Camino, because of the way it

13   looked?

14   A    Yes.  The loud muffler, the loud exhaust.

15   Q    The loud exhaust?

16   A    Yeah.

17   Q    You mentioned the loud exhaust.  And you have actually

18   testified previously in relation to this case; is that correct?

19   A    Yes.

20   Q    In a hearing in this courtroom?

21   A    Correct.

22   Q    In front of Judge Moore?

23   A    Yes.

24   Q    And Mr. Pepin was here?

25   A    Yes.

1   Q   And the prosecution?

2   A   Yes.

3   Q   And there was, at the same time, a court reporter, here?

4   A   Yes.

5   Q   And she was taking down what you were saying?

6   A   Yes.

7   Q   And, at that time, you also took an oath?

8   A   Yes.

9   Q   And you swore, like we saw today, to tell the truth?

10  A   Yes.

11  Q   And at that time, you were also asked about what it was

12  that you noticed about the El Camino?

13  A   Yes.

14  Q   What drew your attention to it?

15  A   Yes.

16  Q   And at that time, Mr. Pepin asked you what the reasons were

17  for noticing the El Camino?

18  A   Yes.

19  Q   You said, *Due to the way it looked*; does that sound

20  accurate?

21  A   If that's what my testimony said, then, yes, it's accurate.

22  Q   You said *The suspension looked to be high*?

23  A   Yes.

24  Q   And Mr. Pepin asked you, *Was that the only reason*?

25  A   Okay.

Officer Eugene VanDyk – Cross

1   *Q*   And you said *No*.  And said, *Were there other reasons*?  You

2   said, *Due to the way it looked the raised suspension*; does that

3   sound accurate?

4   *A*   Yes, that's what it says, then, yes.

5   *Q*   You didn't mention the loud muffler?

6   *A*   If I didn't testify to that, originally, then I did not

7   mention that.  No.

8   *Q*   After Mr. Pepin clarified exactly what drew your attention

9   to the car, you did not mention the loud muffler?

10  *A*   I did not, at that time.

11          *THE COURT*:  All right.  We're going to take a break

12  for the evening.  What I will tell you, ladies and gentlemen,

13  is the following, again, I know you have heard it, but I'm

14  going to keep saying it, during the course of the evening

15  break, this recess, do not discuss the case with anyone outside

16  of the courtroom.  Do not talk about the case amongst

17  yourselves.  Please keep an open mind.  You just begun to have

18  the presentation of evidence.  You have not heard any one

19  witness' complete testimony.  The evidence is far from closed.

20  You have not heard the arguments of counsel or the instructions

21  of the Court.  Do not watch, listen to or pay attention to any

22  media reports, if any.  Do not do anything in an attempt to

23  gain any additional knowledge about this case, the defendant,

24  any witness, any attorney.  Do not do any form of research or

25  investigation, whatsoever.

1    Now, the final thing I will say, I'm directing the two

2   of you members, Ms. Huff and Mrs. Finger, you may recall

3   earlier I said you can have water, no food, you two may,

4   because of medical conditions, need to bring some small snack

5   into the courtroom.  If you feel the need to do so, you are

6   permitted to do so, and need not ask for permission from me.

7   With that, you are excused.  Tomorrow morning, be in the jury

8   room, across the hall, at 9 o'clock, and I will call you into

9   the courtroom and we will begin at 9.  Thank you.  You are in

10  recess.

11    (Jury out at 4:54 p.m.)

12    THE COURT:  We went to a little after 7 on Friday, and

13  I promised my staff I would make it up to them, so I'm giving

14  them 7 extra minutes today in an attempt to make it up to them.

15    Officer VanDyk, what I would ask, instruct you to do,

16  to not to discuss your testimony with anyone over the course of

17  the evening's recess, including members of the prosecution

18  team, and we will see you tomorrow morning at 9 o'clock, ready

19  to pick up where we left off.  Okay?

20    THE WITNESS:  Yes, Your Honor.

21    THE COURT:  Beyond that, let me just ask a very

22  general question, is what is admitted, what we've seen, or is

23  what we've seen only a portion of what was admitted?

24    MR. McNEILLY:  As far as the video, Your Honor?

25    THE COURT:  Yeah.

Officer Eugene VanDyk – Cross

1      MR. McNEILLY:  What is admitted is what was seen.  So

2   there are just two clips.

3      THE COURT:  All right.  All right.  I just want to

4   make sure I understand what's going on.

5      MR. McNEILLY:  I think there may be one photo that

6   didn't get published; that wasn't admitted.

7      THE COURT:  Is there anything else that we need to

8   talk about?  I don't think so.

9      MR. PEPIN:  Not that I know of, Your Honor.

10      THE COURT:  Have a good evening.  Give them a couple

11   more minutes to clear the elevators, and I will see you in the

12   morning.

13      THE COURTROOM DEPUTY:  All rise.  Court is in recess.

14      (Recess at 4:56 p.m.)

15                            **INDEX**

16   **Item**                                                      **Page**

17   ITEM                                                       PAGE

18   OPENING STATEMENTS

19      By Mr. McNeilly                                          21

20      By Mr. Pepin                                             26

21   WITNESSES

22      Officer Eugene VanDyk

23          Direct Examination By Mr. McNeilly                   35

24          Cross-examination By Ms. Suelau                      55

25                      PLAINTIFF'S EXHIBITS

Officer Eugene VanDyk – Cross

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 2       |         | 43       |         |          |           |
| 1       |         | 51       |         |          |           |

### REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above–entitled matter.   Dated at Denver, Colorado, this 23rd day of November, 2017.


*S/Tamara Hoffschildt*
Tamara Hoffschildt